UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ELVIS LORENZO GARCIA,

              Petitioner,

    v.

M. ELIOT SPEARMAN,

              Respondent.

Case No. 17-cv-06377-EMC

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

## I.    <u>INTRODUCTION</u>

Elvis Lorenzo Garcia filed this action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his conviction and sentence from Santa Cruz County Superior Court. Respondent has filed an answer to the petition, and Mr. Garcia has not filed a traverse. For the reasons discussed below, the petition is denied.

## II.    <u>BACKGROUND</u>

A.    <u>The Crime</u>

The California Court of Appeal described the evidence presented at trial:

> In 2008, Jane Doe was a 23–year–old barista and manager at the Kind Grind coffee shop in Santa Cruz. On the morning of March 19, she arrived at the shop to prepare for opening. Shortly thereafter, defendant entered the shop, demanded money, and sexually assaulted Doe at knifepoint. After assaulting her, defendant put Doe in an unplugged refrigerator, pushed a table against the refrigerator door, and fled with $160 from the cash register. Three years later, police matched defendant's DNA to DNA found in sperm collected from Doe's body and underwear.

> *1. Testimony of Jane Doe*

> At trial, Doe testified as follows. At around 6:00 a.m. on March 19, 2008, she walked from her apartment in Santa Cruz to the Kind Grind coffee shop at the mouth of the lower harbor. She unlocked

the doors, entered the shop, and began preparing it for opening. Doe was alone at the time. The cash register drawer, holding $160 in bills and $40 in change, had been placed in a refrigerator for safe keeping. About 15 to 20 minutes after Doe unlocked the doors, a young Latino man entered the shop. He was wearing khaki pants, a blue shirt, and a black hooded sweatshirt with silver writing on it.

Before Doe could tell the man the shop was still closed, he rushed toward her while repeating, "Where is the money?" Doe saw the flash of a knife in his right hand. The man put the knife to Doe's neck, and she repeatedly told him, "Take the money. It's in the fridge." The man told Doe to get on the floor, whereupon she laid on the floor face down. While holding the knife to her back, the man told Doe to take her pants off. She pleaded, "No. No. Please. No. No. Just take the money." She feared he would stab or kill her.

Doe was unable to remove her pants while lying on the floor, so she pushed herself up to a kneeling position. While she was trying to lower her pants, the man put his hand into her shirt, moved it under her bra, and groped her breast. She again begged the man, "Please stop." After she pulled her pants down, he began sodomizing her from behind. He inserted his penis into her anus, removed it, and inserted it again. At the same time, the man was licking his fingers and touching her vagina. He reached around her stomach and put his fingers inside her vagina. She kept begging him to stop, but he told her, "shut the fuck up," and "[b]e quiet." The man inserted his penis into her anus two or three times. He inserted his fingers in her vagina at the same time he was sodomizing her. Doe could not tell whether defendant ejaculated. She estimated the sexual assault lasted around three to five minutes.

When the man finished sodomizing Doe, he told her, "Where's the money. Get the money." She got up, pulled her pants up, and took him to the refrigerator where she had stored the cash register drawer. The man followed her from behind. She took the cash drawer out of the refrigerator and set it on a counter. The man then took her into the kitchen and told her to get into another refrigerator. This second refrigerator was unplugged, and there were no keys for the lock on the door. When Doe told the man the doors would not lock, he took her to a gelato freezer, but the freezer did not have enough space for her. At that point, the man took her back to the unplugged refrigerator, and she got in. He shut the door, and Doe heard the sound of a table being pushed against the door. Doe stayed quiet until she heard the man leave, at which point she pushed her way out of the refrigerator.

After escaping from the refrigerator, Doe used the coffee shop's telephone to call 911. Her cell phone was missing; she never saw it again. After the police arrived and interviewed Doe, they took her to the Watsonville Hospital where she underwent a SART exam. Police canvassed the area around the coffee shop but were unable to locate the assailant at that time. When police examined the coffee shop's cash register drawer, there were no bills in it; only the change had been left behind.

2

*2. Medical, Forensic, and Other Evidence*

The SART exam uncovered evidence of physical trauma consistent with Doe's description of the offense. Doe arrived at the hospital at around 7:00 a.m. on the morning of the assault, and the exam began at 10:20 a.m. Doe appeared to be in shock, and she reported suffering pain in the genital and anal area. The SART nurse observed two linear red marks on Doe's neck and another linear red mark on her back. The marks were consistent with a knife blade being pushed against Doe's skin. Doe also had red marks on her left knee.

In the genital area, Doe exhibited redness on the labia minora consistent with pressure being applied to her skin. She suffered two lacerations to the perineum tissue just above the anus consistent with blunt force trauma. The lacerations appeared to be fresh or recent. The anus exhibited redness and bruising, and a portion of the tissue had suffered an abrasion. These injuries were consistent with blunt force from a penis. The nurse recovered an opaque, viscous fluid with the appearance of semen from inside Doe's anal canal. The nurse collected swabs of the fluid and preserved them for further analysis. Doe's clothing and underwear were also collected and labeled as evidence.

Subsequent analysis of the fluid swabbed from Doe's anus and underwear revealed the presence of sperm. DNA extracted from the sperm was subsequently matched to defendant's DNA at 15 loci. The prosecution's DNA expert estimated the chance of a random match at 15 loci to be one in 23 quintillion for the Hispanic population. [Footnote omitted]

The police arrested defendant on March 11, 2011. His residence was directly adjacent to the apartment building where Doe lived at the time of the offense. At the time of his arrest, defendant was wearing a brand of shoes which featured treads having the same pattern of tread prints left on the kitchen floor of the coffee shop.

*People v. Garcia,* No. H040262, 2016 WL 3179762, at *1-3 (Cal. Ct. App. May 27, 2016).

B.     Procedural History

Following a jury trial in Santa Cruz County Superior Court, Mr. Garcia was convicted of forcible sexual penetration by a foreign object, forcible sodomy, sexual battery by restraint, second degree commercial battery, second degree robbery, and aggravated kidnapping. The jury found several sentence enhancement allegations to be true, including the allegation that the defendant personally used a deadly and dangerous weapon in the commission of the offenses. On October 16, 2013, Mr. Garcia was sentenced to a term totaling 65 years, four months to life in prison.

Mr. Garcia appealed. The California Court of Appeal affirmed his conviction, with a

sentence modification that reduced Mr. Garcia's sentence to a total of 58 years, four months to life in prison. *See Garcia*, 2016 WL 3179762, at *11. The California Supreme Court denied Mr. Garcia's petition for review.

Mr. Garcia also sought habeas relief in the state courts. The California Court of Appeal and the California Supreme Court summarily denied his petitions for writ of habeas corpus. Docket No. 20-18 at 225, 263.

Mr. Garcia then filed this action to obtain a federal writ of habeas corpus. He alleges the following claims in his petition: First, he contends that trial counsel provided ineffective assistance of counsel by (a) failing to obtain a neuropsychological evaluation recommended by Dr. Brady, and (b) failing to utilize Dr. Brady's report and Mr. Garcia's school records as mitigating evidence at sentencing. Second, Mr. Garcia contends that trial counsel was ineffective in not arguing that the sentence imposed amounted to cruel and unusual punishment. Third, Mr. Garcia contends that the California Court of Appeal deprived him of his Sixth and Fourteenth Amendment rights by denying his request for expert funding in connection with the ineffective-assistance claims alleged above. Respondent has filed an answer. Mr. Garcia has not filed a traverse, although the deadline by which to do so has passed. The matter is now ready for decision.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Santa Cruz County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

### IV.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to

4

any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

Section 2254(d) generally applies to unexplained as well as reasoned decisions. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). When the state court has denied a federal constitutional claim on the merits without explanation, and there is no lower state court decision to "look through" to, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

# V.    DISCUSSION

A.    Ineffective-Assistance-Of-Counsel Claims

    1.    Counsel's Reliance On One Psychologist's Report Without Obtaining A Neuropsychological Evaluation To Present With Second Psychologist's Report And Mr. Garcia's School Records At Sentencing

Mr. Garcia urges that trial counsel was ineffective in failing to obtain a neuropsychological evaluation to use at sentencing, and in failing to present a second psychologist's report and school records at sentencing. Although the issues for decision here do not concern Mr. Garcia's competency to stand trial, it is necessary to discuss some competency proceedings because some of the relevant evidence came from two psychologists who were trying to determine whether Mr. Garcia was competent to stand trial.

    a.    Background

Before trial, trial counsel considered whether to request a court-ordered examination to determine whether Mr. Garcia was competent to stand trial. Trial counsel first contacted Dr. John Brady, a clinical psychologist and forensic examiner, to obtain a confidential psychological evaluation of Mr. Garcia. Docket No. 20-18 at 253 (Reilly Decl.).

Dr. Brady did a "comprehensive psychological assessment," Docket No. 28-1 at 31, and concluded that Mr. Garcia was competent to stand trial. *See id.* at 32. In his report, Dr. Brady also mentioned that Mr. Garcia had attended school through about the tenth grade, had "learning problems," and had been "involved in special educational courses" from an early age, *id.* at 24-25; that Mr. Garcia's test results suggested "some cognitive dysfunction," *id.* at 27; and that Mr. Garcia had been diagnosed with a minor depressive disorder, *id.* at 26. Dr. Brady also stated that his assessment supported four additional conclusions about "soft cognitive areas [that] may impact Mr. Garcia's global reasoning abilities in certain cognitive areas not specifically addressed" by the guidelines for assessing competency to stand trial. *Id.* at 32. Those conclusions were that Mr. Garcia: (1) "has some short-term and intermediate memory issues"; (2) appeared to have "problems with attention span and seeing consequences from antecedent behaviors"; (3) had a "compromised" "organizational (executive mental function)" and a "diagnosis of ADHD

6

negatively impacts on his prioritizing of life events (related to dysexecutive function)"; and (4) "may have some undiagnosed mild cognitive dysfunctions not addressed during this assessment." *Id.* Dr. Brady then stated: "The opinions provided here regarding Mr. Garcia's cognitive mental status, of course, are not tantamount to a complete neuropsychological assessment. Moreover, a more definitive neurological evaluation would necessitate the use of more sophisticated medical and psychological testing such as an MRI, PET, or SPECT (single photon tomography). It is my hope that the information in this report will better enable you to address your client's needs." *Id.* at 33. Dr. Brady did not state that additional mental problems would be established or ruled out by such testing but only that the preliminary diagnosis could not be confirmed without more extensive testing.

Trial counsel did not seek a more definitive neurological evaluation. However, based on his own observations, as well as the information from Dr. Brady's report and statements made by Mr. Garcia's family, trial counsel filed a declaration declaring a doubt about Mr. Garcia's competency. *See* Docket No. 20-18 at 254-55 (citing California Penal Code §§ 1367(a), 1368(b)). The criminal proceedings were suspended, and the trial court appointed Dr. Thomas Reidy to determine whether Mr. Garcia was competent to stand trial. *Id.* at 255.

Dr. Reidy submitted a competency evaluation report dated March 28, 2012, concluding that Mr. Garcia was competent to stand trial but had "below average cognitive ability." *See* Docket No. 20-3 at 155. Dr. Reidy also reported that Mr. Garcia had "an IQ equivalent standard score of 74, which falls in the Below Average range. . . . suggest[ing] that although the defendant is not mentally retarded his thinking and reasoning are below average." Docket No. 20-3 at 153-54. Based on an interview with Mr. Garcia, Dr. Reidy determined that Mr. Garcia's comments "are consistent with the test findings and my overall impression that this defendant is cognitively slow but not mentally ill or mentally retarded." *Id.* at 154.

Also before trial, trial counsel had available Mr. Garcia's school records. *See* Docket No. 28-1 at 38 (April 5, 2011, letter from Public Defender's office investigator requesting, and handwritten note approving release of, school records). The school records showed that Mr. Garcia had dropped out of school in the tenth grade, had learning problems, and had been in

special education classes from an early age. The school records also showed that Mr. Garcia's academic performance was adversely impacted by his poor attendance at school. *See, e.g.,* Docket No. 28-1 at 52 ("the major concern of the IEP team is Elvis' lack of credits and poor attendance"). At least one of the school records cast some doubt on whether Mr. Garcia actually had below-average intelligence. *See* Docket No. 28-1 at 59 (school psychologist report stating that the results of the Universal Nonverbal Intelligence Test results indicated that Mr. Garcia's "cognitive functioning falls within the Average range. He obtained a Full Scale IQ score of 98, which means he did as well or better than 45 out of 100 students compared to the standardization sample.").

After Mr. Garcia was convicted, trial counsel prepared a sentencing memorandum that mentioned, among other things, Mr. Garcia's mental deficits and learning difficulties. Docket No. 20-4 at 233. The sentencing memorandum mentioned that Mr. Garcia had familial and social difficulties throughout his youth, "had learning difficulties and dropped out of high school in the 10th grade. . . . Mr. Garcia's learning difficulties were a result of impaired cognitive functioning." Docket No. 20-4 at 234. Trial counsel attached to the sentencing memorandum a copy of Dr. Reidy's competency evaluation report and highlighted that this court-appointed psychologist had concluded that Mr. Garcia had "below average cognitive ability." *Id.* at 20-4 at 234-35. The sentencing memorandum explicitly identified Mr. Garcia's mental condition as a mitigating circumstance to be considered at sentencing. *Id.* at 238. Trial counsel did not attach Dr. Brady's competency evaluation report or Mr. Garcia's school records to the sentencing memorandum. At the sentencing hearing, trial counsel did not discuss Mr. Garcia's cognitive impairments and instead focused on a concurrent versus consecutive sentencing issue.

At sentencing, the prosecutor urged that the sentence should be 82 years to life in prison plus a determinate term of 7 years four months. Docket No. 20-4 at 196, 209. The defense argued that the sentence should be 25 years to life in prison plus a determinate term of five years, four months in prison. Docket No. 20-4 at 254. The trial court sentenced Mr. Garcia to a total of 65 years, four months to life in prison. (On appeal, the California Court of Appeal modified the sentence to make it a total of 58 years, four months to life in prison.)

b.     State Habeas Proceedings

Mr. Garcia claimed in his petition for writ of habeas corpus filed in the California Supreme

Court that trial counsel had provided ineffective assistance of counsel in connection with

sentencing.  Mr. Garcia faulted trial counsel for failing to obtain a neuropsychological assessment

and for relying solely on Dr. Reidy's report to make a case for mitigation instead of also

submitting Dr. Brady's report and Mr. Garcia's school records.

The California Supreme Court invited Respondent to present a declaration from trial

counsel.  *See* Docket No. 20-18 at 249.  Respondent obtained that declaration and filed it.  *Id.* at

249-59.

In his declaration, trial counsel discussed his view of the psychological evidence and

explained why he did not pursue a further neuropsychological evaluation:

> My personal evaluation of the two psychological examinations was
> that Dr. Brady and Dr. Reidy had reached essentially comparable
> conclusions, but that Dr. Brady thought that Mr. Garcia might be
> suffering from some cognitive defect not specifically pertinent to a
> determination of competency to stand trial.  It did not, however,
> appear to me that the four issues mentioned by Dr. Brady, even if
> confirmed by the additional testing which he felt necessary to "a
> complete neurological assessment", would be of any assistance in
> the defense of Mr. Garcia at trial.  Even if present, they would not
> give rise to a defense of insanity and, although his combined
> psychological deficits suggested a diminished capacity to form the
> specific intent necessary to the commission of some of the crimes
> with which he was charged, that defense had been abolished by
> Penal Code section 25 and was not available to him at trial.

Docket No. 20-18 at 256.  Trial counsel also explained that he did not obtain, for purposes of

sentencing, the "more sophisticated medical and psychological testing referred to in Dr. Brady's

report . . . because it appeared to me that even if that testing established the additional cognitive

deficits that Dr. Brady thought might be present . . . , those particular deficits would not

significantly add to the mitigating effect of the psychological information already provided to the

court in Dr. Reidy's report."  *Id.* at 257 (internal quotation marks omitted).

Trial counsel stated that his sentencing memorandum "addressed all issues that [he]

considered pertinent for decision by the court in determining an appropriate sentence in this case."

Docket No. 20-18 at 256.  Trial counsel did not attach Dr. Brady's report to the sentencing

9

memorandum because he believed the two psychologists "had reached essentially comparable conclusions" and he thought Dr. Reidy's report, which he did attach to the sentencing memorandum, would carry more weight with the court because Dr. Reidy was the court-appointed expert. *Id.*

The California Supreme Court denied Mr. Garcia's petition without discussion. *See* Docket No. 20-18 at 263. Because there is no reasoned state court decision on the federal constitutional claim, this Court "must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. *Harrington v. Richter*, 562 U.S. at 102.

c.    Analysis of Claim

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id* at 687-88. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690-91. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

A "doubly" deferential judicial review is appropriate in analyzing ineffective-assistance-of-counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The

United States District Court
Northern District of California

"question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. at 105.

There are "'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'" *Harrington v. Richter*, 562 U.S. at 106 (quoting *Strickland*, 466 U.S. at 689). "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Id.* at 109 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)). The California Supreme Court reasonably could have determined that this was just such a case – where trial counsel reasonably chose to tackle the sentencing issues with one emphasis, and petitioner later claiming that counsel should have emphasized something else. Here, trial counsel focused on avoiding consecutive sentences rather than dwelling on the mitigating circumstance of Mr. Garcia's mental deficits. For the reasons discussed below, it was not an unreasonable application of *Strickland* for the California Supreme Court to conclude that the methods used by trial counsel reflected reasonable tactical decisions and that no prejudice resulted from trial counsel's actions.[1]

Although Mr. Garcia's mental condition was not the highlight of the defense case, trial counsel *did* call attention to Mr. Garcia's mental condition in the sentencing memorandum and *did* urge that it was a mitigating circumstance. Trial counsel submitted a detailed sentencing memorandum in which he ultimately argued for a sentence totaling 30 years, four months to life in prison. Docket No. 20-4 at 254. The sentencing memorandum mentioned Mr. Garcia's learning difficulties, cognitive problems, and low IQ. *Id.* at 234-35. In a section entitled "Circumstances in Mitigation," counsel pointed out that, "in addition to having no prior record of convictions (Rule 4.23(b)(1)), [Mr. Garcia] was also suffering from a mental condition (impaired cognitive function exacerbated by the influence of PCP), which significantly reduces his culpability for

---

[1] Mr. Garcia does not disagree with trial counsel's declaration that the proposed evidence would not have enabled him to avoid conviction on any of the offenses. Without any showing that the evidence would have had any bearing on Mr. Garcia's guilt or innocence, the question on habeas is whether the evidence should have been obtained for sentencing purposes.

commission of these offenses.  (Rule 4.423(b)(2))."  Docket No. 20-4 at 238.[2]  Trial counsel also attached Dr. Reidy's competency evaluation report as an exhibit to the sentencing memorandum, and that evaluation discussed Mr. Garcia's cognitive deficits.  Docket No. 20-4 at 258-61.  Trial counsel also argued that, for the determinate terms, the midterm sentence should be selected because "the factors in aggravation do not outweigh the factors in mitigation."  *Id.* at 253.  (The prosecution did not disagree with the information about Mr. Garcia's mental condition; he simply did not address it.  *See* Docket No. 20-4 at 196 (People's Sentencing Memorandum); Docket No. 20-16 at 4-21 (sentencing hearing transcript).)  Mr. Garcia's mental condition thus was mentioned in the defense sentencing memorandum, even though it was not the centerpiece of that memorandum or of the defense argument at sentencing.

Trial counsel focused most of his efforts at sentencing on trying to avoid consecutive sentencing on the offenses that carried 25-to-life terms.  Mr. Garcia had been convicted of two counts of sodomy by use of force and one count of sexual penetration by a foreign object using force and violence.  Each of those three crimes carried a 25-to-life sentence,[3] and the main question at Mr. Garcia's sentencing was whether those 25-to-life sentences would run

---

[2] The California Rules of Court list aggravating and mitigating circumstances to help the sentencing judge to select an appropriate sentence from the range of options available, e.g., whether to impose the upper, middle, or lower term of years.  *See* Cal. Rule of Court 4.420 – 4.425.  The list of mitigating circumstances includes "factors relating to the crime and factors relating to the defendant."  Cal. Rule of Court 4.423.  The mitigating factors related to the defendant are:  "(1) The defendant has no prior record, or has an insignificant record of criminal conduct, considering the recency and frequency of prior crimes; (2) *The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime*; (3) The defendant voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process; (4) The defendant is ineligible for probation and but for that ineligibility would have been granted probation; (5) The defendant made restitution to the victim; and (6) The defendant's prior performance on probation, mandatory supervision, postrelease community supervision, or parole was satisfactory."  Cal. Rules of Court 4.423(b) (emphasis added).

[3] The basic sentence for forcible sodomy or forcible sexual penetration normally would be 3, 6, or 8 years, *see* Cal. Penal Code §§ 286(c)(2), 289(a)(1)(A), but Mr. Garcia was subject to a mandatory 25-to-life sentence for each of his three sex offenses because of other facts found true.  Each of his three sex offenses carried a 25-to-life sentence under California Penal Code § 667.61 because, for each sex offense, the jury had found true the special allegations that Mr. Garcia had kidnapped the victim and the movement of the victim substantially increased the risk of harm to the victim; had committed the offense during the commission of a burglary; and had personally used a dangerous or deadly weapon in the commission of the offense.  *See* Cal. Penal Code § 667.61(d)(2) and (e)(1, 2, 4).

concurrently or consecutively.[4]  The prosecutor argued that the 25-to-life sentences on the sexual penetration and the two sodomy counts should all run consecutively, and the trial counsel argued that they should all run concurrently.  The trial court found that the sexual penetration and sodomy occurred on separate occasions and thus had no discretion to sentence those 25-to-life terms concurrently.  *See* Cal. Penal Code § 667.6(d).  The trial court imposed a 25-to-life sentence for the sexual penetration to run consecutively to a 25-to-life sentence for one of the sodomy counts, and the 25-to-life sentence for the other sodomy count to run concurrently with the 25-to-life sentence for the first sodomy count.

Whether the three sex offenses would result in concurrent or consecutive sentences under § 667.6(d) depended on the facts of the crime, not the characteristics of the defendant.  *See* footnote 4.  Neither a neuropsychological evaluation, an additional psychological report, nor school records would have enabled trial counsel to argue against consecutive sentencing on the sex

---

[4] California Penal Code § 667.6(d) (effective November 8, 2006 to December 31, 2018) provides:

> A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) [including sodomy by force and sexual penetration by a foreign object using force and violence] if the crimes involve separate victims or involve the same victim on separate occasions.

> In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions.

> The term shall be served consecutively to any other term of imprisonment and shall commence from the time the person otherwise would have been released from imprisonment.

If consecutive sentencing were not mandatory under § 667.6(d), a court would have discretion to impose a consecutive sentence under § 667.6(c) ("a full, separate, and consecutive term *may be imposed* for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion."). *Garcia*, 2016 WL 3179762, at *4.  But if the offenses were committed on "separate occasions," as the sentencing court here found, imposition of consecutive sentences under subdivision (d) is determined without regard to personal characteristics of the defendant.

offenses. The California Supreme Court reasonably could have concluded that it was not deficient performance for trial counsel to focus the bulk of his efforts on avoiding the 75-to-life sentence that the prosecutor was urging the court to impose. And because the concurrent versus consecutive sentencing decision under § 667.6(d) turned on the facts of the crime, rather than the attributes of the defendant, the California Supreme Court reasonably could have determined that no prejudice resulted from the failure to obtain and present a neuropsychological evaluation and from the failure to present Dr. Brady's report and Mr. Garcia's school records with regard to the 25-to-life sentences.

The California Supreme Court also reasonably could have decided that trial counsel's decision not to obtain neuropsychological testing, and not to present a second psychological evaluation and school records at sentencing, was not deficient performance and did not result in any prejudice with regard to the offenses (i.e., sexual battery, commercial burglary, and robbery) that had determinate terms. "'[T]he relevant inquiry under *Strickland* is not what defense counsel could have pursued, but rather whether the choices made by defense counsel were reasonable.'" *Atwood v. Ryan*, 870 F.3d 1033, 1064 (9th Cir. 2017) (alteration in original). It would have been reasonable for trial counsel, and the California Supreme Court, to conclude that further evidence of Mr. Garcia's mental impairment and school history would not have added anything of practical value beyond that which was already in the record for sentencing purposes on the offenses that had determinate sentences. The report of Dr. Reidy, the court-appointed psychologist, plainly conveyed the highlights: "although [Mr. Garcia] is not mentally retarded his thinking and reasoning are below average"; Mr. Garcia had an IQ equivalent score of 74; and Mr. Garcia "exhibited below average cognitive ability." Docket No. 20-3 at 153-54. With these issues already highlighted in the record in easily understood language, the California Supreme Court reasonably could have determined that it was a reasonable strategic choice for counsel to choose not to pursue a complete neuropsychological evaluation or present a second psychological evaluation and school records to add further details about Mr. Garcia's mental deficits, and that no

prejudice resulted.[5]

As noted above, the prosecution didn't dispute the defense information about defendant's mental condition. The judge never indicated he disbelieved the defense evidence that the defendant was cognitively impaired.

Mr. Garcia argues that failure to use Dr. Brady's report was deficient because, unlike Dr. Brady's report, "Dr. Reidy's report was devoted to only competency to stand trial issues." Docket No. 1 at 32. He also urges that the two reports were not cumulative: Dr. Reidy's conclusion was that Mr. Garcia "is cognitively slow but not mentally ill or mentally retarded," whereas Dr. Brady's conclusion contains mention of four specific areas of cognitive deficiencies and states that Mr. Garcia may have organic brain damage. *Id.* He urges that presenting *two* reports "is a fact that could have only inured to [his] benefit." *Id.* But this is the sort of "nothing to lose" argument that the Supreme Court has specifically rejected as insufficient to show deficient performance. *See Knowles v. Mirzayance*, 556 U.S. 111, 121 (2009) ("This Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims.").

In any event, the California Supreme Court could reasonably have determined that no prejudice would have occurred as a result of counsel's alleged omissions. First, the sentencing judge had described the crime as "horrific" and indicated that, even if mandatory consecutive sentences were not required for the sodomy and digital penetration, he would have sentenced consecutively in the exercise of his discretion. Docket No. 20-16 at 13. Second, the trial court found that there were three aggravating circumstances; those almost certainly would have outweighed the mitigating circumstance of a mental impairment even with further proof of that impairment.[6] Third, had trial counsel put greater emphasis on Mr. Garcia's cognitive deficits, the

---

[5] The Supreme Court could have considered the fact that this was a sodomy/sexual assault at knifepoint during a robbery, followed by locking the victim in a refrigerator, and was not a case involving, *e.g.*, a drunken sexual encounter or a theft of unattended property – where the defendant might have been better positioned to argue that some cognitive impairment interfered with his understanding the wrongfulness of his conduct. For example, Mr. Garcia urges that the school records would have showed that he had been in special education for a very long time, had trouble taking the bus to school, and had an IQ of 74. But it is unlikely that these sorts of details would have changed the sentencing judge's evaluation of an appropriate sentence for Mr. Garcia.

[6] At sentencing, the court stated that the "[f]actors in aggravation involve those outlined in Rules

15

prosecutor likely would have blunted the impact of that evidence by discussing facts of the crime that showed some criminal sophistication. Specifically, Mr. Garcia had taken steps to enable a successful getaway: after sexually assaulting and robbing the victim, he tried different options before settling on forcing the victim into a walk-in refrigerator and pushing a table in front of the door so that she could not easily escape from it. This evidence of planning would cut sharply against an effort to suggest that Mr. Garcia should be given a sentencing break because of his mental impairments.

The California Supreme Court's rejection of Mr. Garcia's ineffective-assistance-of-counsel claim was not contrary to, or an unreasonable application of, clearly established federal law as set forth by the U.S. Supreme Court. Mr. Garcia therefore is not entitled to relief on this claim.

### 2. Failure To Argue Sentence Amounted To Cruel And Unusual Punishment

As discussed in the preceding section, Mr. Garcia had cognitive impairments and was below average in intelligence. He was 18 years, 5 months, and 18 days old on the day he committed the crime. *See* Docket No. 28-1 at 41 (listing date of birth as October 2, 1989); *Garcia*, 2016 WL 3179762, at *1 (crime occurred on March 19, 2008). Mr. Garcia contends that counsel provided ineffective assistance when he failed to argue that, in light of Mr. Garcia's mental impairments and near-juvenile status, the 65-years-to-life sentence amounted to cruel and unusual punishment under the Eighth Amendment. Docket No. 1 at 36. He urges that counsel should have argued that, because Mr. Garcia "is a less mature [individual] than an average 18-year-old, as applied to him, and taking into account the scientific and social science principles described in *Graham* and *Miller*, a functional life without parole sentence for non-homicide offences is cruel and unusual punishment." *Id.* at 37.

During the habeas proceeding in the California Supreme Court, trial counsel submitted a declaration in which he explained his reason for not making such an argument: "I did not argue

---

of Court 4.421(a)(1), (a)(3) and (b)(1)." Docket No. 20-16 at 15. The citations refer to the following aggravating circumstances: "The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness"; "The victim was particularly vulnerable"; and "The defendant has engaged in violent conduct that indicates a serious danger to society." Cal. Rule of Court 4.421(a)(1, 3), (b)(1).

that the imposition of consecutive sentences would be cruel and unusual punishment pursuant to the *Roper*, *Graham*, and *Miller* line of U.S. Supreme Court decisions because those cases addressed the sentencing of juvenile defendants and Mr. Garcia had turned 18 prior to the commission of the conviction offenses." Docket No. 20-18 at 258 (Reilly Decl.).

The California Supreme Court denied the ineffective-assistance claim without discussion. Because there is no reasoned state court decision on the federal constitutional claim, this Court "must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. *Harrington v. Richter*, 562 U.S. at 102.

As mentioned above, to show ineffective assistance of counsel under the Sixth Amendment, a criminal defendant must show deficient performance by counsel and resulting prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984). As also mentioned above, a federal habeas court engages in a "doubly" deferential review when analyzing an ineffective-assistance-of-counsel claim when 28 U.S.C. § 2254 applies. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). The "question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. at 105.

Here, the alleged ineffective assistance of counsel consisted of trial counsel failing to argue the federal constitutional claim that the sentence imposed violated the Eighth Amendment. It thus is necessary to consider whether there was potential merit to such an argument because counsel does not engage in deficient performance by failing to raise a nonmeritorious issue. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (counsel's performance not deficient for failing to raise meritless objection); *Rupe v. Wood*, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take a futile action can never be deficient performance).

The U.S. Supreme Court issued three significant cases about the Eighth Amendment's prohibition on cruel and unusual punishment as it applies to juvenile offenders. In *Roper v. Simmons,* 543 U.S. 551, 578 (2005), the Supreme Court held that the Eighth Amendment forbids

the "imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."  In *Graham v. Florida*, 560 U.S. 48, 82 (2010), the Supreme Court held that the Eighth Amendment "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide."  In *Miller v. Alabama*, 567 U.S. 460, 465 (2012), the Supreme Court held that "mandatory life without parole [sentences] for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.'"  Nothing in *Miller*, *Graham*, or *Roper* precludes a sentence of life imprisonment without the possibility of parole (LWOP) or a de facto LWOP sentence for an adult offender, even a young adult offender who is 18.

Indeed, the Supreme Court recognized in *Roper* that a line had to be drawn for the special sentencing rules for young offenders, and chose to draw the line at age 18.

> Drawing the line at 18 years of age is subject, of course, to the objections always raised against categorical rules.  The qualities that distinguish juveniles from adults do not disappear when an individual turns 18.  By the same token, some under 18 have already attained a level of maturity some adults will never reach.  For the reasons we have discussed, however, a line must be drawn.  The plurality opinion in *Thompson [v. Oklahoma*, 487 U.S. 815 (1988)] drew the line at 16.  In the intervening years the *Thompson* plurality's conclusion that offenders under 16 may not be executed has not been challenged.  The logic of *Thompson* extends to those who are under 18.  The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest.

*Roper*, 543 U.S. at 574.  Neither *Graham* nor *Miller* disturbed that dividing line.  The Supreme Court cases thus mandate special consideration only for juvenile offenders (i.e., those offenders who committed their offenses while chronologically under the age of 18 years) and do not mandate special consideration of offenders who committed their offenses at age 18 or later.[7]  *See also People v. Argeta*, 210 Cal. App. 4th 1478, 1482 (Cal. Ct. App. 2012) ("Making an exception for a defendant who committed a crime just five months past his 18th birthday opens the door for

---

[7] The U.S. Supreme Court has held that the Eighth Amendment prohibits executing a mentally retarded offender.  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  But the U.S. Supreme Court has not held that *Atkins* applies to any sentence less than death.  Mr. Garcia does not urge that *Atkins* supports relief for him.

18

the next defendant who is only six months into adulthood. Such arguments would have no logical end, and so a line must be drawn at some point. We respect the line our society has drawn and which the United States Supreme Court has relied on for sentencing purposes.").

Mr. Garcia urges that the principles in *Graham* and *Miller* support relief for him because of his mental impairments and because he was just five months past his 18th birthday. Although there may be some logical force behind that argument, neither *Graham* nor *Miller* held that the existence of mental impairments requires that, for Eighth Amendment purposes, the young adult offender should be treated as the equivalent of a juvenile. Because Mr. Garcia was not a juvenile at the time he committed his offenses, the holdings of *Roper*, *Graham* and *Miller* establishing a constitutional limit on sentencing do not apply to him. The U.S. Supreme Court simply has not determined that young adult offenders, with or without mental impairments, have a right to the same consideration as juvenile offenders for sentencing purposes.

The federal courts of appeals also have been unreceptive to efforts to extend the *Roper*, *Miller*, and *Graham* line of cases to adult offenders with impaired mental faculties. *See, e.g., United States v. McCurry*, 832 F.3d 842, 844 (8th Cir. 2016) (although defendant receiving 15-year sentence had "below average" cognitive skills and had IQ scores of 55 at age 16 and 78 at age 18, Eighth Amendment was not violated because defendant "does not face capital punishment or life imprisonment without the possibility of parole"); *United States v. Cobler*, 748 F.3d 570, 580-81 (4th Cir. 2014) (rejecting categorical challenge to 120-year sentence by defendant with developmental immaturity because case did not involve LWOP sentence for a juvenile offender nor a sentence of death, "the only two contexts in which the Supreme Court categorically has deemed sentences unconstitutionally disproportionate"); *United States v. Marshall*, 736 F.3d 492, 499-500 (6th Cir. 2013) (upholding 5-year mandatory minimum sentence; even if adult offender's growth hormone deficiency rendered him "unable to grow up," he could not be treated as a juvenile offender); *id.* at 500 ("Regardless of the source of the immaturity, an immature adult is still an adult. Because Marshall is not a juvenile, he does not qualify for the Eighth Amendment protections accorded to juveniles."); *In re Garner*, 612 F.3d 533, 535 (6th Cir. 2010) (categorical challenge to death penalty by developmentally disabled adult offender with limited IQ had no

chance of success; "The *Roper* Court did not hold that the Eighth Amendment prohibits a death sentence of an offender with a 'mental age' of less than 18. Rather, the *Roper* Court clearly held that a sentence of death may not be imposed upon an offender with a *chronological* age of less than 18.").

Here, trial counsel explained that he chose to forego an argument relying on *Roper*, *Graham*, and *Miller* because Mr. Garcia had turned 18 before committing his offenses. The California Supreme Court reasonably could have rejected Mr. Garcia's ineffective-assistance-of-counsel claim on the deficient performance prong because the U.S. Supreme Court had already rejected the argument Mr. Garcia now contends should have been made. That is, the U.S. Supreme Court chose the chronological age of 18 years as the dividing line for the juvenile/adult offender distinction, even while recognizing that the dividing line is not a perfect fit for all cases. *See Roper*, 543 U.S. at 574. Counsel did not engage in deficient performance by failing to raise a nonmeritorious issue. *See Juan H.*, 408 F.3d at 1273; *Rupe*, 93 F.3d at 1445.

Likewise, the California Supreme Court reasonably could have rejected the ineffective-assistance-of-counsel claim on the prejudice prong: given the U.S. Supreme Court's explicit acceptance of the chronological age of 18 years as the cut-off for juvenile offender treatment (and the federal courts of appeals' unreceptiveness to arguments that adult offenders with impaired mental faculties should be treated as juveniles), there was no reasonable probability of a different outcome had trial counsel argued for an extension of the juvenile-offender rules to a person who committed his offense when he was a young adult, even if he was an adult with cognitive difficulties.

For these reasons, the California Supreme Court's summary rejection of Mr. Garcia's ineffective-assistance-of-counsel claim was not contrary to or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court. The state court could have reasonably determined that making an Eighth Amendment argument based on *Graham* and *Miller* would have been an exercise in futility because Mr. Garcia was not a juvenile offender. He is not entitled to the writ on this claim.

B.     <u>State Appellate Court's Denial Of Request For Funding To Hire Expert</u>

   1.     <u>Background</u>

      While his direct appeal was pending but before he filed his state habeas petitions, Mr. Garcia requested the California Court of Appeal to authorize expenditure of several thousand dollars to pay for a psychologist to conduct a neuropsychological evaluation of Mr. Garcia. Initially, he applied for $16,450 to hire a psychologist to conduct a full neuropsychological evaluation. Docket No. 28-1.

      When that request was denied, Mr. Garcia submitted a renewed application for $7,500 to hire a different psychologist to conduct the neuropsychological evaluation. Docket No. 28-3. In his renewed application for funds, Mr. Garcia represented that the neuropsychological evaluation was necessary to establish that trial counsel provided ineffective assistance "by failing to retain a mental health expert to evaluate Mr. Garcia to [sic] what extent his young age . . . , cognitive and intellectual difficulties . . . , and psychosocial immaturity played a part in the crimes of conviction," and by failing to argue that the sentence was cruel and unusual punishment due to Mr. Garcia's mental condition and young age at the time of the crimes. *Id.* The funding request described the results of the mental health evaluations that already had been done by Dr. Reidy and Dr. Brady (e.g., their findings that Mr. Garcia had below average intelligence and cognitive impairments) and attached Dr. Brady's report as an exhibit.

      The California Court of Appeal rejected the renewed application for funding, according to Mr. Garcia's state habeas/appellate counsel.

   2.     <u>Habeas Petition Filed In California Supreme Court</u>

      In his petition for writ of habeas corpus in the California Supreme Court, Mr. Garcia argued that his federal rights to due process and assistance of counsel were violated by the California Court of Appeal's denial of his requests for funds to obtain a neuropsychological evaluation "which would have likely confirmed Dr. Brady's preliminary diagnosis." Docket No. 20-18 at 52. Mr. Garcia's state petition (prepared by an attorney) did not clearly explain how there had been a denial of the right to effective assistance of counsel. It appears that he means that state habeas counsel could not effectively assist Mr. Garcia in the state habeas proceeding because

state habeas counsel could not obtain the neuropsychological evaluation that he wanted to use to show trial counsel's ineffectiveness for failing to obtain that evaluation.

The California Supreme Court denied Mr. Garcia's petition without discussion. *See* Docket No. 20-18 at 263. Because there is no reasoned state court decision on the federal constitutional claim, this Court "must determine what arguments or theories supported or . . . could have supported the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the U.S. Supreme Court. *Harrington v. Richter*, 562 U.S. at 102.

### 3.   Analysis

The first issue that must be examined is whether there is any "clearly established Federal law, as determined by the Supreme Court of the United States," that would control resolution of Mr. Garcia's claim because the existence of such law is a necessary predicate to relief in any habeas case (such as this one) governed by the AEDPA. See 28 U.S.C. § 2254(d)(1). When there is no "clearly established Federal law, as determined by the Supreme Court of United States," the state court's adjudication of the claim cannot be said to be an unreasonable application of such law. *See Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Mr. Garcia's claim concerns events that occurred as part of his collateral attack on his conviction. He sought funds to conduct a post-conviction neuropsychological evaluation to potentially use as support for a claim that he intended to present in his state habeas petition. He urges that the California Court of Appeal's denial of his funding request denied him due process and effective assistance of counsel in the state habeas proceeding. The evidence he wanted to obtain could not have been presented on appeal and would have to be presented in a state habeas proceeding because the claim would have been based on materials outside the record on appeal. *See People v. Merriam*, 66 Cal. 2d 390, 396 (Cal. 1967) (matters outside the record are not generally reviewable on appeal), *overruled on other grounds by People v. Rincon–Pineda*, 14 Cal. 3d 864, 882 (Cal. 1975). Mr. Garcia's federal habeas claim goes to the substance of the California Court of Appeal's decision in connection with a potential state habeas proceeding, not a claim on direct appeal. His claim thus asserts a mistake in the state habeas proceeding, even if there was no

22

state habeas petition on file at the time he requested the funds.

The Supreme Court has never determined that there is a constitutional right to state court collateral review of a conviction, such as a state habeas proceeding. In *Case v. Nebraska*, 381 U.S. 336 (1965), the Supreme Court granted certiorari "to decide whether the Fourteenth Amendment requires that the States afford state prisoners some adequate corrective process for the hearing and determination of claims of violation of federal constitutional guarantees." *Id.* at 337. However, the Supreme Court ultimately did not decide the issue because, after certiorari was granted, Nebraska enacted a statute providing a post-conviction remedy that allowed for consideration of claims of the denial of federal constitutional rights. *Id.* The Supreme Court determined that Nebraska's new statute appeared to provide the sort of hearing at issue and therefore remanded the case for reconsideration in light of the supervening statute. *Id.* The resolution of *Case* thus shows that it was an open question at that time whether there was a constitutional right to state-court collateral review of a state court conviction. *See generally Kyles v. Whitley*, 498 U.S. 931, 932 (1990) (Stevens, J., concurring in order denying stay of execution) (citing *Case* for the proposition that "the scope of the State's obligation to provide collateral review is shrouded in so much uncertainty"); *Huffman v. Florida*, 435 U.S. 1014, 1017 (1978) (Stevens, J., concurring in denial of certiorari) (citing *Case* in support of proposition that, although summary reversal may have been appropriate on direct review of the conviction, and although the petitioner may succeed in a federal habeas petition, it "does not follow" "that this Court has the power to compel a State to employ a collateral post-conviction remedy in which specific federal claims may be raised."). No subsequent Supreme Court case has been located that resolves the issue left undecided in *Case*.[8] If there is no constitutional right to collateral review, any error committed by the state court in the course of a collateral review proceeding would not give rise to the federal constitutional violation asserted here.

---

[8] According to one authority, the Supreme Court never had occasion to revisit the issue left open in *Case* because "after the Court's decision in that case every State in the Union did, in the exercise of reasonably deliberate speed, adopt an adequate State procedure that would be available to a state prisoner seeking postconviction relief." *Richardson v. Miller*, 716 F.Supp. 1246, 1252 (W.D. Mo. 1989).

The Supreme Court has determined there is not a federal constitutional right to counsel in a state postconviction relief action, apparently basing the decision in part on the presumed absence of a federal constitutional right to state collateral review. *See Pennsylvania v. Finley*, 481 U.S. 551 (1987) (rejecting claim of a constitutional right to counsel on state collateral review). With regard to a state postconviction relief action, *Finley* concluded: "States have no obligation to provide this avenue of relief, and when they do, the fundamental fairness mandated by the Due Process Clause does not require that the State supply a lawyer as well." *Id.* at 557 (citation omitted).

Mr. Garcia mentions only one U.S. Supreme Court case pertaining to funding in a criminal case: *Ake v. Oklahoma*, 470 U.S. 68 (1985). That case simply cannot be stretched far enough to encompass the right Mr. Garcia asserts. *Ake* addressed the issue of whether an indigent defendant who had exhibited signs of severe mental illness had a right to psychiatric examination and assistance to prepare a defense when his sanity was in question in a capital case. The Supreme Court held that, "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." *Id.* at 74. The centrality of the defendant's mental state to the issues of his criminal culpability and punishment in the capital case was critical to the Supreme Court's determination that the indigent defendant must be provided access to a competent psychiatrist upon an adequate showing. *See id.* at 80-83. "[A]s in the case of the provision of counsel," the Supreme Court left "to the State the decision on how to implement this right." *Id.* at 83. *Ake* would have to be greatly extended to apply to Mr. Garcia's facts. Unlike *Ake*, Mr. Garcia did not make a pretrial request for funding; his request was for funding in a *postconviction* proceeding. And unlike *Ake*, Mr. Garcia's potential claim did not pertain to sanity, competence at trial, or a death sentence. The question is not whether this Court might think *Ake* should be extended to cover a funding request in a postconviction relief proceeding, but rather whether the state court's failure to do so was contrary to, or an unreasonable application of, *Ake*. The Supreme Court has made clear that a state court's failure to extend a Supreme Court rule to a new context does not support relief under § 2254(d)(1).

"Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably *applies* this Court's precedent; it does not require state courts to *extend* that precedent or license federal courts to treat the failure to do so as error." *White v. Woodall*, 572 U.S. 415, 426 (2014) (in capital case, not objectively unreasonable for state court not to extend to penalty phase constitutional rule that applies to guilt phase). There is no clearly established law extending *Ake* to postconviction proceedings not involving the death penalty.

The only other case cited by Mr. Garcia in support of his denial-of-funding claim is *California v. Trombetta*, 467 U.S. 479, 485 (1984). *See* Docket No. 1 at 40. In *Trombetta,* the question was whether the due process requirement that the State disclose to criminal defendants evidence that is material to guilt or to punishment imposed on the State a duty to preserve potentially exculpatory evidence. *Trombetta*, 467 U.S. at 480-81. The Supreme Court held that "the Due Process Clause . . . does not require that law enforcement agencies preserve breath samples in order to introduce the results of breath-analysis tests at trial." *Trombetta*, 467 U.S. at 491. *Trombetta* is simply irrelevant to the issue presented in Mr. Garcia's case, as the evidence he was trying to develop with the funds he sought was not evidence ever possessed by the State. Given *Trombetta*'s inapplicability, the California Supreme Court's rejection of the habeas claim that the denial of funds denied Mr. Garcia his rights to due process and to assistance of counsel was not an unreasonable application of, or contrary to, *Trombetta*.

California Penal Code section 1241 permits funding for counsel's "compensation and necessary expenses" to represent a criminal defendant on direct appeal and, apparently, in post-conviction proceedings beyond the direct appeal. The existence of this state statute that may establish a right to funding of investigations in connection with state court habeas proceedings does not help Mr. Garcia because federal habeas relief is not available for a misapplication of state law. *See Swarthout v. Cooke*, 562 U.S. 216, 219-20 (2011).

Mr. Garcia's claim that the denial of funding prevented his state habeas counsel from providing effective assistance in his state habeas proceeding fails. The Supreme Court has held that there is no constitutional right to assistance of counsel in a state collateral review proceeding. *See Finley*, 481 U.S. 551. Without a constitutional right to assistance of counsel, there cannot be a

1    claim when the assistance provided falls short in some respect.

2           Mr. Garcia's claim that the denial of funding violated his right to due process fails because

3    the U.S. Supreme Court has not recognized a federal constitutional right to a state collateral

4    review proceeding such as a state habeas action.  When the California Supreme Court considered

5    Mr. Garcia's claim that the denial of his funding request deprived him of his right to due process,

6    there was no "clearly established Federal law, as determined by the Supreme Court of the United

7    States," 28 U.S.C. § 2254(d)(1), to apply to his claim.  Without the existence of clearly established

8    federal law, the California Supreme Court's rejection of the claim cannot be said to be contrary to

9    or an unreasonable application of such law.  *See Carey v. Musladin*, 549 U.S. at 76–77; *see, e.g.,*

10   *id.* (given the lack of holdings from the Supreme Court and the wide divergence of the lower

11   courts on the issue of the potentially prejudicial effect of spectators' courtroom conduct, the state

12   court's determination that the petitioner was not inherently prejudiced by spectators wearing

13   buttons depicting the murder victim was not contrary to or an unreasonable application of clearly

14   established Supreme Court law); *Varghese v. Uribe*, 736 F.3d 817, 821 (9th Cir. 2013) (because

15   there is no Supreme Court authority that squarely addresses petitioner's claim—that a criminal

16   defendant's rights to counsel and due process are violated when the state court conditions his

17   access to, and testing of, the prosecution's limited evidence on the disclosure of the test results to

18   the prosecution—the state appellate court had no specific rule to apply, so its decision was not an

19   unreasonable application of clearly established Supreme Court precedent); *Foote v. Del Papa*, 492

20   F.3d 1026, 1030 (9th Cir. 2007) (Nevada Supreme Court's rejection of petitioner's conflict of

21   interest claim was neither contrary to nor an unreasonable application of clearly established

22   federal law; although Supreme Court had held an irreconcilable conflict between a defendant and

23   his trial counsel may entitle him to new counsel, no Supreme Court case had held an irreconcilable

24   conflict between the defendant and his appointed appellate counsel violates the Sixth

25   Amendment).  Section 2254(d)(1) requires the denial of Mr. Garcia's claim.

26   C.     No Certificate of Appealability

27          A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

28   which "reasonable jurists would find the district court's assessment of the constitutional claims

26

debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a certificate of appealability is **DENIED**.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: October 1, 2019

_____
EDWARD M. CHEN
United States District Judge